**MARYLAND CASUALTY COMPANY,**
**Plaintiff,**

v.

**Thomas MALONE, Jr.; Drew T. Green, and Nutragenomics, MFG, LLC; Defendants.**

**Civil Action No. 1:13–CV–823–SCJ.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed March 11, 2015.

---

Christopher Cody Meeks, Seth M. Friedman, Weissman Nowack Curry & Wilco, P.C., Atlanta, GA, for Plaintiff.

Louis Levenson, Levenson & Associates, Atlanta, GA, Gregory O. Shenton, Shenton Law, P.C., Marietta, GA, for Defendants.

## ORDER

STEVE C. JONES, District Judge.

This matter is before the court on Defendants Green and Nutragenomics, MFG, LLC's motion to strike offer of judgment [58]; Plaintiff's motion for summary judgment [59]; Defendants Green and Nutragenomics, MFG, LLC's cross-motion for summary judgment [69]; and Defendants Green and Nutragenomics, MFG, LLC's motion for leave to file cross-motion for summary judgment *nunc pro tunc* [84].

## I. Background

### A. Procedural History

On March 15, 2013, Plaintiff, Maryland Casualty Company, filed suit against Defendants Nutragenomics, MFG, LLC; Nutragenomics, LLC, a fictitious company; Thomas Malone, Jr.; and Drew Green, seeking to rescind the insurance policies issued by Maryland Casualty to Nutragenomics, LLC. In the alternative, Maryland Casualty seeks a declaration that it does not owe a duty to defend or a duty of coverage to Nutragenomics, LLC. Because it sought rescission of the insurance contracts, the same day Maryland Casualty filed its complaint, it also filed a motion to deposit funds—the insurance premiums— into the registry of the court. A month later, however, Maryland Casualty discovered that Nutragenomics, MFG, LLC had filed for bankruptcy. Because of the bankruptcy stay, Maryland Casualty withdrew its request to deposit funds into the registry of the court and stated it would not pursue a rescission claim in district court at that time. *See* Docket Entry [7]. Maryland Casualty's motion, however, made clear that it would "seek guidance" from the bankruptcy court as to its rescission claim. *Id.* at 1–2. The court granted Maryland Casualty's request to withdraw

the rescission claim. *See* Docket Entry [10].

Shortly thereafter, Maryland Casualty informed the court that the Trustee for Nutragenomics MFG's bankruptcy estate had abandoned the liability insurance policies and thus the bankruptcy court had no jurisdiction over Maryland Casualty's claims. *See* Docket Entry [20], at 1–2. Maryland Casualty then filed a motion to amend its complaint to re-assert the rescission claim noting that the bankruptcy court had lifted the automatic stay as to Maryland Casualty's claims against Nutragenomics MFG. *See* Docket Entry [26]. No opposition was filed to this motion and the court granted it on October 11, 2013. Maryland Casualty again sought leave to deposit the insurance premium funds into the registry of the court in conjunction with its renewed rescission claim. *See* Docket Entry [30]. The court granted that motion. *See* Docket Entry [43].

Defendants Green and Nutragenomics MFG made an offer of judgment to Plaintiff on March 18, 2014 and filed it on the court's docket. *See* Docket Entry [57]. Defendants then filed a motion to strike their offer of judgment stating that they recognize the offer should only be filed on the docket if it is accepted. Maryland Casualty does not oppose the motion to strike. The court GRANTS Defendants Green and Nutragenomics, MFG, LLC's motion to strike offer of judgment [58].

## B. Facts

Maryland Casualty issued a liability policy to Nutragenomics, LLC for the policy period of May 3, 2010 through May 3, 2011 and renewed the policy for May 3, 2011 through May 3, 2012. Drew Green founded Nutragenomics MFG in December 2009. Thomas Malone joined Nutragenomics MFG after its founding and was a member until March 22, 2012, when he sold his membership interest to Green.

Nutragenomics MFG filed for bankruptcy on October 8, 2012.

Prior to declaring bankruptcy, Nutragenomics MFG purchased and sold chemicals designed to mimic the effects of marijuana, known as synthetic cannabinoids. *See* Docket Entry [59], Ex. 6 (Plea Agreement of Thomas Malone, Jr., entered on Sept. 19, 2012) and Ex. 7 (Plea Agreement of Drew Green, entered on Sept. 7, 2012). If any particular chemical used by Nutragenomics MFG became a banned chemical, Defendants would replace it with a slightly altered chemical that had the same effects. *Id.* Nutragenomics MFG purchased these chemicals and prepared them for sale by *inter alia* packing and labeling them. *Id.* In response to Maryland Casualty's Request for Admission No. 1 "Admit that Nutragenomics MFG packaged its products or those of any Person," Defendants "admit[ ] that Nutragenomics MFG re-packaged chemicals in foil bags only and that any further packaging that may have occurred was not done by Nutragenomics MFG." *See* Docket Entry [59], Ex. 8, at 3–4 (response of Defendant Green), Ex. 9, at 3–4 (response of Defendant Nutragenomics MFG), Ex. 10, at 3–4 (response of Defendant Malone). Further, in response to Request for Admission No. 3 "Admit that Nutragenomics MFG labeled or re-labeled its products or those of any Person," Defendants admitted "that Nutragenomics MFG labeled products from China with name, lot, and expiration date. Defendant denies the remainder of this Request." *Id.*, at 4 (responses of all Defendants).

Nutragenomics MFG also developed its own blend of synthetic cannabinoids called Mr. Miyagi and provided custom formulations on request. *See* Docket Entry [59], Ex. 6 (Plea Agreement of Thomas Malone, Jr., entered on Sept. 19, 2012) and Ex. 7 (Plea Agreement of Drew Green, entered

on Sept. 7, 2012). Nutragenomics MFG sold synthetic cannabinoids throughout the United States and generated tens of millions of dollars in annual revenue. *Id.* Products containing these chemicals were sold under various names including potpourri, incense, and others. *Id.* Mr. Miyagi was packaged as potpourri and its packaging contained the legend "Warning: Our Potpourri is not for human consumption ... [T]his product complies with all U.S. federal laws." *Id.* However, Defendants actually intended for their products, such as Mr. Miyagi, to be smoked and knew that one or more of Nutragenomics MFG products were unsafe and illegal. *Id.*

On April 30, 2012, the State of West Virginia filed suit against Nutragenomics MFG and Green for claims relating to the sale of Nutragenomics MFG's products. *See* Docket Entry [59], Ex. 11 (West Virginia complaint). The lawsuit alleges that Nutragenomics MFG's products were: (1) sold under false labels; (2) harmful to humans; and (3) sold in violation of state criminal and consumer protection laws. *Id.* The lawsuit also alleges that Nutragenomics MFG and Green intentionally misrepresented that Nutragenomics MFG's products were safe, legal, and "not intended for human consumption" when they knew that Nutragenomics MFG's products were intended for human consumption despite their inherently unsafe and illegal nature. *Id.* Green and Nutragenomics MFG were served with the West Virginia lawsuit in May 2012, but did not provide notice to Maryland Casualty at that time.

On July 25, 2012, several law enforcement agencies raided Nutragenomics MFG's offices in Georgia. *See* Docket Entry [59], Ex. 6 (Plea Agreement of Thomas Malone, Jr., entered on Sept. 19, 2012) and Ex. 7 (Plea Agreement of Drew Green, entered on Sept. 7, 2012). On September 4, 2012 Defendants Malone and Green were indicted in the United States District Court for the Western District of Louisiana on sixteen counts, including conspiracy to distribute and possess with the intent to distribute a Schedule I controlled dangerous substance and conspiracy to introduce and cause to be introduced misbranded drugs into interstate commerce. *See* Docket Entry [59], Ex. 15. Malone and Green pleaded guilty to the charge of conspiracy to distribute and possess with intent to distribute a Schedule I controlled dangerous substance. As part of their pleas, Defendants Malone and Green executed identical statements of stipulated facts setting forth their involvement in the development, packaging, labeling, and sale of Mr. Miyagi. *See* Docket Entry [59], Ex. 6 (Plea Agreement of Thomas Malone, Jr., entered on Sept. 19, 2012) and Ex. 7 (Plea Agreement of Drew Green, entered on Sept. 7, 2012).

In those statements of fact, Defendants Malone and Green acknowledge they were aware that Mr. Miyagi and Nutragenomics MFG's products were illegal and would be consumed for the purpose of "getting high" and that, despite this knowledge, they labeled Mr. Miyagi "not for human consumption" and "compli[ant] with all U.S. federal laws." *Id.* Malone and Green also admitted that their strategy was to attempt to avoid state and federal laws targeting synthetic cannabinoids by discontinuing chemicals and introducing slightly altered chemicals that had the same effect. *Id.* None of the Defendants provided Maryland Casualty with notice of the criminal action.

On December 26, 2012, Defendants were sued in Kentucky state court for personal injury claims arising from the use of a product identified as "Bang Bang Potpourri." *See* Docket Entry [59], Ex. 18. The Kentucky lawsuit alleges that Defendants marketed, distributed, and/or sold a "safe and legal synthetic marijuana intended for

smoking" when, in fact, they knew or should have known that the product or its ingredients were unsafe, unreasonably dangerous, defective, illegal, and likely to cause physical injury. On January 23, 2013, Malone tendered his defense in the Kentucky lawsuit to Maryland Casualty, but neither Green nor Nutragenomics MFG have provided notice of the Kentucky lawsuit nor received a defense. Malone and Green were subsequently dismissed from the Kentucky lawsuit for lack of personal jurisdiction, but Nutragenomics MFG remains a party.

On May 11, 2010, Defendant Malone spoke with Iris Turner at The Wickham Agency to apply for a liability insurance policy for a company he identified as Nutragenomics, LLC. Wickham submits applications for insurance on its clients' behalf to various insurers, including Maryland Casualty and its affiliated companies. At the time Malone spoke with Turner, Wickham submitted applications to Maryland Casualty electronically through a website which agents could access through a secure internet connection using a unique username and password. Additionally, Wickham records the information it receives from its clients on ACORD application forms.

To complete Nutragenomics, LLC's application for insurance, Turner called Malone to discuss Nutragenomics, LLC's business, operations, and products. During this conversation, Malone stated that Nutragenomics, LLC was engaged in the sale of natural health food products. Turner then contacted the underwriting department associated with Maryland Casualty to determine if a company in that line of business would be eligible for a policy. Turner was directed to the Health Foods/Products classifications and logged onto the website where she found the description for "Health Foods–All Other" classification. Turner reviewed the classification with Malone, including the description of ineligible operations which are:

> Any operations that manufacture or formulate (including mixing or blending) any products; Any operations that repackage, label or re-label any products; Any operations currently engaged in the sale of products containing Ephedra; Any operations that do not obtain vendors coverage and certificates of insurance from all manufacturers of dietary supplements, products used for weight gain or loss, muscle enhancement, bodybuilding and athletic performance (e.g., natural and synthetic steroids); Weight Loss Centers.

*See* Turner Aff., ¶ 12. Malone told Turner that Nutragenomics LLC did not do anything ineligible, specifically including packaging or manufacturing. Turner copied the description of the ineligible operations into the ACORD application form and completed the rest of the form with Malone's assistance. After completing the ACORD application form, Turner faxed it to Malone for his review. She asked Malone to confirm that Nutragenomics LLC's business and operations were consistent with the description he gave and did not involve ineligible operations and that the remainder of the responses were correct. Malone did not respond with any changes. Turner then submitted the application information to Maryland Casualty using the website.

Based on the information provided to it, Maryland Casualty issued the policies to Nutragenomics, LLC under Maryland Casualty's "Precision America Retail Program," which is a line of policies intended to apply to retail sales and operations, including "Health Foods—All Other" classification: "Establishments engaged in retailing food supplement products such as vitamins, nutrition supplements, organic

products, and body enhancing supplements on a non-prescription basis."

Sharon Hawkins, Director of Underwriting for Farmers Insurance, testified that she oversees underwriting for Maryland Casualty Company. *See* Hawkins Aff., ¶ 2. She is familiar with the kinds of insurance issued by Maryland Casualty, as well as the process and standards for underwriting those insurance policies, including the policies at issue in this lawsuit. *Id.*, ¶ 3. She reviewed the underwriting information submitted for Nutragenomics, LLC. *Id.*, ¶ 4. Although the Precision America Retail Program is no longer offered by Maryland Casualty, Hawkins is familiar with the classes of businesses that would have been eligible to receive insurance under this program. *Id.*, ¶ 5. Hawkins is also familiar with the manner in which underwriting business records are maintained by Maryland Casualty. *Id.*, ¶ 6.

Hawkins testified that before the issuance of the policies, Maryland Casualty was not informed by Nutragenomics MFG, Malone, or Green that the actual name of the applicant was Nutragenomics MFG, LLC. *Id.*, ¶ 18. Furthermore, in the application for insurance, Malone responded "no" to the question "Products of Others Sold or Re–Packaged Under Applicant Label?" *Id.*, ¶ 21. Hawkins testified from an underwriting perspective, there is "a substantial difference between a policyholder conducting retail sales and operations and a policyholder engaging in the manufacture, development, formulation, distribution, wholesaling, packaging, re-packaging, labeling and/or re-labeling of products. This difference changes the nature, extent and character of the risks being insured." *Id.*, ¶ 23. She continued:

> Had MCC [Maryland Casualty] known that Nutragenomics MFG was engaged in [ ] the manufacture, development, formulation, distribution, wholesaling, packaging, re-packaging, labeling, and/or re-

labeling of products, MCC would not have offered a policy to Nutragenomics MFG."

*Id.*, ¶ 24.

## C. Contentions

Maryland Casualty files suit seeking to rescind the insurance policies pursuant to O.C.G.A. § 33–24–7 due to material misrepresentations made by Defendant Malone during the application process. In the alternative, Maryland Casualty asks the court to declare it has no duty to defend or indemnify Defendants because they (1) breached the notice requirements of the policy, (2) no allegations of "occurrence" are made in the underlying civil suits, (3) the "expected or intended" exclusion bars coverage, (4) the illegal activities exception bars coverage, and (5) Defendant Malone was no longer a named insured as of March 22, 2012.

Defendants Green and Nutragenomics MFG respond that Maryland Casualty may not rescind the policies because they failed to properly tender rescission. They further assert there is a question of fact as to whether Malone made a material misrepresentation. Defendants Green and Nutragenomics MFG also argue that the court should not resolve any coverage issues because there is not a "case or controversy" before the court on whether Maryland Casualty owes a duty to defend or indemnify as no claim has been made under the policies.

Defendant Malone responds that whether a misrepresentation in the insurance application is material is a question for the jury and not appropriate for resolution on a motion for summary judgment. He further argues that he did provide Maryland Casualty with notice of the only action of which he was aware and he did not have a duty to provide notice of the criminal ac-

tion because he was no longer an insured at the time of the indictment.

## II. Discussion

### A. Preliminary Matters

#### 1. *Fifth Amendment*

██ Defendants object to Maryland Casualty's use of the plea agreements entered into by Malone and Green to support its statement of material undisputed facts. Defendants cite to *Continental Casualty Company v. Parker,* 161 Ga.App. 614, 617, 288 S.E.2d 776 (1982), for the proposition that a judgment of conviction or acquittal in a criminal prosecution may not be used to establish facts in a civil case. With respect to its statement of facts, however, Maryland Casualty does not rely only on the existence of the criminal conviction, but rather points to facts admitted in the plea agreements signed by Malone and Green. Furthermore, Federal Rule of Civil Procedure 56 is a matter of procedural law and the court applies federal law to the question of whether Defendants have sufficiently controverted any of Plaintiff's statement of material undisputed facts. *See, e.g., Royalty Network, Inc. v. Harris,* 756 F.3d 1351, 1357 (11th Cir.2014).

In *Secretary, Department of Labor v. Seibert,* 464 Fed.Appx. 820 (11th Cir.2012) (per curiam), the Eleventh Circuit held that it was proper for a court to consider admissions from a plea agreement in a subsequent civil case. There, the Secretary of Labor brought suit against Floyd Seibert, the former administrator of a pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging breach of fiduciary duty. The district court used admissions made by Seibert in his deposition as well as his plea agreement to charges of health care fraud and embezzlement and ERISA theft/embezzlement to determine that Seibert was responsible for certain transactions and decisions made by the plan which deprived the plan of assets. The court determined that Seibert's conduct violated certain ERISA provisions.

On appeal, Seibert argued that his statements from earlier criminal plea agreements should not have been admitted as evidence under Federal Rules of Evidence 403 and 404(b). *Id.* at 823. The Court of Appeals rejected that argument finding:

> these statements contained factual admissions pertaining to Seibert's breach of the fiduciary duties he owed as trustee of the Plan. They therefore were highly relevant to the issues being decided, had significant probative value, and were not used for an improper purpose. *Cf. United States v. Killough,* 848 F.2d 1523, 1528 (11th Cir.1988) (holding defendants' statements in prior guilty pleas were admissible because they were relevant to determining issue in civil case). Concern about unfairly misleading or biasing the fact-finder also was not at issue here. *See Woods v. United States,* 200 Fed.Appx. 848, 853 (11th Cir. 2006) (noting that "the part of Rule 403 that authorizes exclusion of evidence because of its unfair prejudicial impact has no logical relationship to bench trials" (quotation marks omitted)). For these reasons, the district court did not abuse its discretion by admitting Seibert's prior statements into evidence. *See id.*

*Id.*

The court's analysis, however, does not end with the plea agreements. During discovery depositions, Green and Malone invoked their Fifth Amendment privilege against self-incrimination in response to most questions proffered by Maryland Casualty's counsel. Similarly, in response to each of Maryland Casualty's statement of fact derived from the plea agreements and submitted in conjunction with its motion for summary judgment, Defendants again

invoked their privilege against self-incrimination.

Unlike in criminal cases where the jury may not draw an adverse inference from a defendant's silence, the Eleventh Circuit held in *Eagle Hospital Physicians, LLC v. SRG Consulting, Inc.,* 561 F.3d 1298 (11th Cir.2009), "that in a civil suit . . . , the court may draw adverse inferences against a party that invokes the Fifth Amendment." *Id.* at 1304 (citing *United States v. Two Parcels of Real Prop. Located in Russell County, Ala.,* 92 F.3d 1123, 1129 (11th Cir.1996)). In *Eagle Hospital,* a defendant in the litigation obtained possession of certain of the plaintiff's documents protected by the attorney-client privilege. These documents had been sent via email and the plaintiff believed that the individual defendant who had previously worked for the plaintiff continued to have access to the plaintiff's confidential emails. In response to questions posed in a deposition concerning whether he had intercepted these protected communications and whether he still had access to such communications, the individual invoked the Fifth Amendment. The district court then drew the adverse inference that the individual maintained the ability to monitor the plaintiff's confidential emails. *Id.* Based on that inference, the district court struck the defendant's answer and entered default judgment against him.

The Court of Appeals found that such an inference was permissible and reasonable. *Id.* The court noted that the "decision to invoke the Fifth Amendment does not have to be consequence-free." *Id.* at 1304 (quotation and citation omitted). Rather, the court "must not so unduly burden the employment of silence as to make the decision to testify involuntary." *Id.* (quotation and citation omitted).

■ There are additional considerations, however, when dealing with summary judgment. The "negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production." *Avirgan v. Hull,* 932 F.2d 1572, 1580 (11th Cir.1991). Thus, courts generally have found that "adverse inference alone is not sufficient to warrant summary judgment" but summary judgment "may be appropriate if supported by independent evidence." *Microsoft Corp. v. Silver Star Micro, Inc.,* Civil Action No. 1:06–CV–1350–WSD, 2008 WL 115006 (N.D.Ga. 2008) (Duffey, J.); *SEC v. Scherm,* 854 F.Supp. 900, 905 (N.D.Ga.1993) (Forrester, J.). For this reason, the court does not deem admitted Maryland Casualty's statements of fact to which Defendants responded only with their invocation of the Fifth Amendment. *See, e.g., LaSalle Bank Lake View v. Seguban,* 54 F.3d 387 (7th Cir.1995).

Here, however, the adverse inferences the court may draw from Defendants' invocation of the Fifth Amendment are supported by independent evidence in the form of the plea agreements entered into by Green and Malone. To the extent there is some question as to the inferences derived from Defendants' Fifth Amendment responses and the facts established in the plea agreements, the court notes that in response to Maryland Casualty's requests for admission, both Defendant Green and Defendant Malone admitted that "Nutragenomics MFG repackaged chemicals in foil bags" and that "Nutragenomics MFG labeled products from China with name, lot, and expiration date." As the court discusses more fully below, these two admissions by themselves would be sufficient to show as a matter of law that Defendant Malone provided materially misleading statements in the insurance application of Nutragenomics, LLC.

2. *Remaining Evidentiary Issues*

■ Defendants Green and Nutragenomics MFG also argue that the court

should not consider the affidavits of Iris Turner and Sharon Hawkins because they are speculative and contain hearsay. They contend that Ms. Hawkins did not actually participate in the decision to issue a policy to Nutragenomics MFG so she "does not have the type of knowledge required to say" whether Maryland Casualty would or would not have issued a policy to Nutragenomics MFG had it had accurate information on the insurance application.

The court disagrees. It is clear from Ms. Hawkins's affidavit that she oversees underwriting for Maryland Casualty. She is familiar with Maryland Casualty's policies and the type of risk the company anticipates for insureds in the "health food" retail line of business. Based on her experience overseeing underwriting for Maryland Casualty, Ms. Hawkins testified that the company would not have insured Nutragenomics MFG had it known that it packaged or labeled products. Ms. Hawkins does not need to have been personally involved in the underwriting decision as to Nutragenomics MFG to have personal knowledge of whether the insurer would underwrite the type of risk associated with the true business operations of Nutragenomics MFG. *See, e.g., Dracz v. American General Life Ins. Co.*, 427 F.Supp.2d 1165, 1167–68 (M.D.Ga.2006) (Land, J.) (relying on affidavit of "Chief Underwriter" of company for testimony that insurer would not have issued particular policy to insured had it known of insured's driving-under-the-influence citation).

■ As to Ms. Turner, Defendants Green and Nutragenomics MFG argue that it is simply not credible that she could remember details from a call four years ago when she places hundreds of insurance policies each year. They further state that Ms. Turner's "self-serving" affidavit should be viewed with a "jaundiced" eye because she wanted the commission on the insurance. *See* Docket Entry [68], at 3–4. De-

fendants Green and Nutragenomics MFG assert that her affidavit is improper because it is based only on her "personal recollection" and not any review of the documents. *Id.* at 4. Significantly, however, Defendants provide no evidence in the record to contest Ms. Turner's affidavit. Defendants' comments that she could not possibly recall the application or their belief that her testimony is less credible because she wanted a commission are wholly speculative argument and not supported by any evidence in the record. Of course, the fact that her affidavit is based on her "personal recollection" is entirely permissible under the Rules of Evidence. As such, Defendants have proffered nothing to dispute Ms. Turner's testimony.

The parties engage in a great deal of back-and-forth about when Maryland Casualty identified Ms. Hawkins or Ms. Turner as persons with knowledge and when Maryland Casualty identified certain documents from Ms. Turner's employer, The Wickham Agency. It is important to consider these matters in the context of the litigation. For obvious reasons, none of the parties invested many resources in discovery. All parties were without a doubt aware of Maryland Casualty's rescission claim and the basis of that claim being material misrepresentations of the nature of Nutragenomics MFG's business on the application form. In its initial disclosures, Maryland Casualty set forth the specifics of what it believed the misrepresentations to be and stated that it would rely on testimony from Defendants as well as a corporate representative of Maryland Casualty to establish facts concerning the insurance application submitted to Maryland Casualty. *See* Plaintiff's Initial Disclosures, dated November 14, 2013. Thus, although not named individually, Defendants were on notice of the potential for Ms. Hawkins's testimony early in discovery. Defendants did not seek any

discovery of Maryland Casualty's corporate representative and thus there is nothing untoward about the identification of Ms. Hawkins, specifically, at the time she filed her affidavit as the corporate representative.

As Maryland Casualty indicated in its Initial Disclosures, it intended to rely on testimony from the corporate representative of Nutragenomics MFG and Mr. Malone to establish facts related to the application for insurance submitted to Maryland Casualty. However, in his deposition, Mr. Malone testified that he could not recall what information he provided on the application. *See* Malone Dep., at 4–7 and 84–97. Having not received any testimony from Mr. Malone, ten days later, on March 13, 2014, Maryland Casualty served Supplemental Initial Disclosures which identified The Wickham Agency as a witness and identified certain documents from Maryland Casualty's application processing system as relevant documents.

Maryland Casualty then filed its motion for summary judgment and relied on the affidavits of Ms. Turner and Ms. Hawkins with respect to its rescission argument. Of great significance, all three Defendants admitted to each statement of fact made by Maryland Casualty in its motion for summary judgment pertaining to the application process Malone engaged in

with Ms. Turner. Having admitted those facts without reservation, there really is nothing more for the court to consider on this matter.[1]

Defendants Green and Nutragenomics also filed a cross-motion for summary judgment arguing they are entitled to summary judgment as a matter of law because the court lacks jurisdiction over Maryland Casualty's claims for declaratory relief since no "actual controversy" exists on the duty to defend and the duty to indemnify. Because the court grants Maryland Casualty's motion for summary judgment as to the rescission claim, the court need not reach issues of duty to defend and indemnify. The court DENIES AS MOOT Defendants Green and Nutragenomics, MFG, LLC's cross-motion for summary judgment [69] and Defendants Green and Nutragenomics, MFG, LLC's motion for leave to file cross-motion for summary judgment *nunc pro tunc* [84].

### B. Material Misrepresentation

■ The court now turns to the substance of Maryland Casualty's rescission claim. Under Georgia law, an insurer may deny coverage to an insured where the insured has made a misrepresentation, omission, concealment of facts, or incorrect statement in his or her application for insurance which is fraudulent or material.

---

1. The court further notes that Defendants did not file any motions related to Maryland Casualty's Supplemental Initial Disclosure at the time it was made on March 13, 2014, and did not oppose the use of such testimony until well into the briefing of Defendants' motion to file a cross-motion for summary judgment. For example, the only argument Defendant Malone made in response to Maryland Casualty's motion for summary judgment as to rescission was his contention that material misrepresentation was a question of fact for the jury. *See* Docket Entry [66], at 2–3. Defendants Green and Nutragenomics MFG did contend that the Hawkins and Turner affidavits contained "hearsay" and "unauthenticated documents" not produced until the end of discovery, but addressed that only as a matter of weight of the evidence. *See* Docket Entry [68], at 2–4. It is not until their reply brief to their motion for leave to file cross-motion for summary judgment that Defendants Green and Nutragenomics specifically ask the court to strike the affidavits of Hawkins and Turner. *See* Docket Entry [86]. Even then, Defendants did not file a separate motion to strike and mention the request only in conjunction with the argument that the court should permit them to file their cross-motion for summary judgment out of time.

See O.C.G.A. § 33–24–7 (2007); *Nappier v. Allstate Ins. Co.*, 961 F.2d 168 (11th Cir. 1992). A misrepresentation is material under section 33–24–7(b)(2) if it would influence a prudent insurer with respect "either to the acceptance of the risk or to the hazard assumed by the insurer." *Id.* As the Eleventh Circuit explained in *American General Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331 (11th Cir. 2009):

> The courts of Georgia have held that a material misrepresentation under subsection 33–24–7(b)(2) is " 'one that would influence a prudent insurer in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance.' " *Lively v. S. Heritage Ins. Co.*, 256 Ga.App. 195, 196, 568 S.E.2d 98, 100 (2002) (quoting *Jackson Nat. Life Ins. Co. v. Snead*, 231 Ga.App. 406, 410, 499 S.E.2d 173, 176 (1998)); *see also Haugseth v. Cotton States Mut. Ins. Co.*, 192 Ga.App. 853, 854, 386 S.E.2d 725, 726 (1989). We have recognized that this standard is objective. "Rather than inquire into what a particular insurer would have done had it known of the insured's misrepresentation ... Georgia courts employ a reasonableness test, an objective standard of conduct against which to measure the effect of the insured's false declarations." *Woods v. Indep. Fire Ins. Co.*, 749 F.2d 1493, 1497 (11th Cir. 1985).

*Id.* at 1340.

■ The insured need not have knowledge of the falsity or act in bad faith for the insurer to deny coverage as long as the misrepresentation is material. *See White v. Am. Family Life Assurance Co.*, 284 Ga.App. 58, 61, 643 S.E.2d 298 (2007). "Materiality is a mixed question of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question." *Woods*, 749 F.2d at 1496.

In *Woods*, an insured misrepresented that he was the owner of the house in which he resided when in actuality he had conveyed the property to his mother in fee simple to prevent his wife from making a claim against it in a divorce proceeding. *Id.* at 1494. The insured conceded that the representation was false but contended that the materiality of the misrepresentation was a question for the jury that could not be decided on summary judgment. *Id.* at 1496. The Eleventh Circuit disagreed and stated:

> [r]easonable minds cannot differ on the materiality of the misrepresentation made here because it went to the core factor of insurable interest, which is not a mere nicety or a matter of administrative convenience. Insurable interest is a keystone of the concept of insurance, safeguarding the insurer against the risk that arises if one who will receive the monetary benefit from loss of the insured property (or life, as it may be) has no interest in the property not being destroyed. Woods's misrepresentation concealed from the insurer the existence of a possible defense of lack of insurable interest.

*Id.*

■ Here, the undisputed facts show that Malone informed Turner that Nutragenomics sold natural health food products and did not "repackage, label, or re-label any products." At the very least, Defendants admit in this litigation that "Nutragenomics MFG repackaged chemicals in foil bags" and that "Nutragenomics MFG labeled products from China with name, lot, and expiration date." There is no dispute, therefore, that Defendant misrepresented the nature of the company's business. Considering the evidence adduced in the plea agreements, the breadth of the misrepresentations is even more clear.

Furthermore, Maryland Casualty proffered the testimony of Sharon Hawkins who stated that from an underwriting perspective, there is "a substantial difference between a policyholder conducting retail sales and operations and a policyholder engaging in the manufacture, development, formulation, distribution, wholesaling, packaging, re-packaging, labeling and/or re-labeling of products. This difference changes the nature, extent and character of the risks being insured." *Id.,* ¶ 23. She further testified that had Maryland Casualty known that Nutragenomics MFG was involved in packaging, re-packaging, labeling, and/or re-labeling of products," it would never have offered a policy to it. *Id.,* ¶ 24.

As the court explained above, Defendants have not proffered any evidence to dispute Ms. Hawkins's testimony. *See Davis v. John Hancock Mut. Life Ins. Co.,* 202 Ga.App. 3, 5–6, 413 S.E.2d 224 (1991) (summary judgment appropriate when insurer provides undisputed testimony of underwriter that company would not have issued policy had it known of specific risk). Moreover, as in *Woods,* reasonable minds cannot differ here on the materiality of the misrepresentation here because it went to the heart of the risk, whether Nutragenomics was simply a retail operation or whether it also repackaged and re-labeled goods.

 Defendants argue that Maryland Casualty can no longer seek rescission because it "abandoned" that claim early in the litigation. Defendants are correct that to pursue rescission, an insurance company must "promptly" move to rescind and tender back the premiums. *See, e.g., Minnesota Lawyers Mut. Ins. Co. v. Gordon,* 315 Ga.App. 72, 74–75, 726 S.E.2d 562 (2012). However, based on the procedural history as recited above, it is clear that Maryland Casualty did immediately seek rescission in its original complaint filed on March 5, 2013, only two months after first learning of the problems with Nutragenomics MFG when Malone tendered to the insurance company his defense to the Kentucky action. Contrary to Defendants' assertions, Maryland Casualty never "abandoned" its claim for rescission or "waffled" on whether to seek rescission. Rather, after learning that Nutragenomics, MFG, LLC had filed for bankruptcy, Maryland Casualty indicated to the court that it would no longer seek rescission in the district court because of the bankruptcy stay, but rather would pursue the matter in bankruptcy court. After the bankruptcy estate abandoned any claims under the policies and the bankruptcy court lifted the stay, Maryland Casualty reinstated its rescission claim in the instant case. The court finds nothing untoward in that process.

Because the court finds that Malone made material misrepresentations in the insurance application, the court grants Maryland Casualty's motion for summary judgment as to rescission [59]. The court need not consider the parties' arguments as to coverage.

### III. Conclusion

The court GRANTS Defendants Green and Nutragenomics, MFG, LLC's motion to strike offer of judgment [58]; GRANTS Plaintiff's motion for summary judgment [59]; DENIES AS MOOT Defendants Green and Nutragenomics, MFG, LLC's cross-motion for summary judgment [69]; and DENIES AS MOOT Defendants Green and Nutragenomics, MFG, LLC's motion for leave to file cross-motion for summary judgment *nunc pro tunc* [84].

The parties are DIRECTED to file a consent order as to the disposition of the funds in the registry of the court within twenty (20) days of the date of entry of this order.

The Clerk of the Court is DIRECTED to CLOSE this case.